# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 05-4468/06-1354

_____

United States of America,                *
                                       *

        Appellee/Cross-Appellant,  *
                                       *

    v.                                  *
                                       *

Steven Spears,                  *
                                       *

        Appellant/Cross-Appellee.  *
                                       *    Appeals from the United States
_____           *    District Court for the
                                       *    Northern District of Iowa.

American Civil Liberties Union  *
Foundation Drug Law Reform Project;  *
American Civil Liberties Union of  *
Iowa; Douglas A. Berman; Michael M.  *
O'Hear; David N. Yellen; David M.  *
Zlotnick; Federal Public Defender of  *
Iowa,                   *
                                       *

        Amici on Behalf of      *
        Appellant/Cross-Appellee.  *

_____

Submitted: June 14, 2006
Filed: December 5, 2006

_____

Before LOKEN, Chief Judge, LAY, WOLLMAN, MURPHY, BYE, RILEY, MELLOY, SMITH, COLLOTON, GRUENDER, BENTON, and SHEPHERD, Circuit Judges, en banc.

_____

RILEY, Circuit Judge.

Steven Spears (Spears) appeals his conviction for conspiracy to distribute 50 grams or more of cocaine base (crack cocaine), in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A), and 500 grams or more of cocaine salt (powder cocaine), in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). The government cross-appeals, arguing the district court erred in granting a downward variance based solely on the district court's categorical rejection of the 100:1 powder cocaine to crack cocaine quantity ratio inherent in the United States Sentencing Guidelines (Guidelines). For the reasons stated below, we affirm Spears's conviction, and we reverse his sentence and remand to the district court for resentencing.

## I.     BACKGROUND

On June 2, 2004, law enforcement responded to an anonymous report of drug trafficking in a room at the Hamilton Inn in Sioux City, Iowa. The responding officers observed a high volume of traffic entering and leaving the hotel room. The officers stopped several vehicles, whose occupants had been observed leaving the room. Upon searching the vehicles, the officers discovered crack cocaine. The officers obtained and executed a search warrant on the hotel room and found Spears, Elliott Ward (Ward), and one other person inside the room. The officers searched Spears and found $805 in cash, but no cocaine. Spears was arrested, and after receiving his Miranda[1] warnings, Spears admitted in a videotaped interview with law enforcement that he previously sold both powder and crack cocaine.

At trial, five cooperating witnesses testified for the government. John Spencer (Spencer) testified he witnessed Spears receive more than two ounces of powder cocaine on ten or more occasions. Spencer said Spears cooked some of the powder cocaine into crack cocaine. Spencer also related that between 2003 and October 2004,

_____

[1]Miranda v. Arizona, 384 U.S. 436 (1966).

he purchased a total of seven to eight ounces or more of crack cocaine from Spears, and then sold smaller quantities to others. Spencer further testified to making trips to Chicago, Illinois, with Spears and purchasing five or more ounces of cocaine per trip. Co-conspirators Calvin Bailey (Bailey) and Ward testified they pooled money with Spears and purchased one-half ounce to nine ounce quantities of powder cocaine from various drug sources. Ward admitted buying both powder and crack cocaine from Spears. Two other cooperating witnesses gave similar testimonies. All cooperating witnesses testified in hopes of receiving reduced sentences.

The jury convicted Spears of conspiracy to distribute 1,792 grams of crack cocaine and 500 grams of powder cocaine. At sentencing, the district court concluded the drug quantities produced a total offense level of 38. Based on Spears's criminal history category of IV, the resulting advisory Guidelines sentencing range was 324 to 405 months' imprisonment. Relying on United States v. Perry, 389 F. Supp. 2d 278 (D.R.I. 2005), Spears argued the application of the 100:1 quantity ratio between powder cocaine and crack cocaine under the Guidelines results in a sentence substantially greater than necessary to promote the objectives of 18 U.S.C. § 3553(a). The district court agreed with Spears and adopted the rationale set forth in Perry. Then, using a 20:1 powder cocaine to crack cocaine quantity ratio, the district court granted Spears a downward variance to a total offense level of 34, which produced an advisory Guidelines range of 210 to 262 months' imprisonment. Thereafter, the district court sentenced Spears to the statutory mandatory minimum of 240 months' imprisonment. Both Spears and the government appeal.

## II. DISCUSSION
### A. Sufficiency of the Evidence
Spears first argues there is insufficient evidence to support his conviction. He asserts the witnesses' testimonies were "highly questionable" based on their criminal backgrounds and their motivations to testify in exchange for leniency. "We review de novo the sufficiency of the evidence, examining the evidence in the light most

favorable to the jury verdict and giving the verdict the benefit of all reasonable inferences." United States v. Wintermute, 443 F.3d 993, 1003 (8th Cir. 2006) (citation omitted).

Five cooperating witnesses testified about their involvement in cocaine trafficking with Spears, including (1) obtaining cocaine from various sources and then distributing the cocaine to assorted customers, (2) cooking powder cocaine into crack cocaine, (3) pooling money to purchase larger quantities of cocaine, and (4) selling the cocaine and splitting the proceeds. The government presented the jury with Spears's videotaped confession, wherein Spears admitted to pooling money with cooperating witnesses in order to purchase and then resell cocaine.

Sufficiency challenges based solely on the credibility of witnesses rarely, if ever, prevail. See, e.g., United States v. Espino, 317 F.3d 788, 794 (8th Cir. 2003). It is within the jury's province to resolve conflicts in the witnesses' testimonies, evaluate their credibility, and afford their testimonies the appropriate weight. United States v. Tabor, 439 F.3d 826, 830 (8th Cir.), petition for cert. filed (May 31, 2006) (No. 06-5244); United States v. Moore, 108 F.3d 878, 881 (8th Cir. 1997) ("On appeal, we do not pass upon the credibility of witnesses or the weight to be given their testimony." (citation and internal quotation omitted)). We conclude sufficient evidence supports Spears's conviction for conspiracy to distribute cocaine base and cocaine salt.

B.    **Admission of Evidence of Prior Conviction**

Spears also argues the district court abused its discretion in admitting evidence of his 2000 felony conviction in Illinois for manufacture and delivery of cocaine. Spears does not deny committing the crime; rather, he contends the evidence of his prior conviction was unduly prejudicial. We disagree.

The district court is granted broad discretion in the admission of evidence under Federal Rule of Evidence 404(b). United States v. Voegtlin, 437 F.3d 741, 745 (8th Cir.), cert. denied, 127 S. Ct. 368 (2006). We will reverse only if the evidence has no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts. Id.

Evidence of prior criminal acts is not admissible to prove the defendant acted in conformity with the prior act, but it may be admissible for other purposes such as proving a defendant's knowledge or intent. See Fed. R. Evid. 404(b). Evidence of prior criminal acts is admissible if the evidence is: "'1) relevant to a material issue; 2) similar in kind and close in time to the crime charged; 3) proven by a preponderance of the evidence; and 4) if the potential prejudice does not substantially outweigh its probative value.'" Voegtlin, 437 F.3d at 745 (quoting United States v. Thomas, 398 F.3d 1058, 1062 (8th Cir. 2005)).

Evidence of Spears's prior drug conviction was relevant to show Spears's knowledge and intent, which were essential elements of the instant offense. Admissibility also is supported because Spears's 2000 conviction for manufacture and delivery of cocaine was similar in kind and close in time to the instant offense. To guard against potential prejudice, the district court gave a limiting instruction to the jury that the evidence of Spears's prior conviction should be considered only on the issues of knowledge and intent. Accordingly, evidence of Spears's prior drug crime was highly probative as to Spears's knowledge and intent to commit the instant drug offense and outweighed any potential undue prejudice.

## C.    Unreasonable Sentence

The final issue before us is the government's cross-appeal challenging the district court's categorical rejection of the Guidelines' 100:1 powder cocaine to crack cocaine quantity ratio and grant of a downward variance using a 20:1 quantity ratio. We review for abuse of discretion the reasonableness of a district court's sentence,

United States v. Haack, 403 F.3d 997, 1003 (8th Cir.), cert. denied, 126 S. Ct. 276 (2005), and we review de novo its application of law, United States v. Fogg, 409 F.3d 1022, 1026 (8th Cir. 2005).

### 1. The 100:1 Ratio, Congress, and the Sentencing Commission

The 100:1 drug-quantity ratio emerged from the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 (codified as amended at 21 U.S.C. § 841(b)) (the 1986 Act), wherein Congress established mandatory minimum sentences for persons convicted of federal drug trafficking offenses. See United States Sentencing Commission, Special Report to the Congress: Cocaine and Federal Sentencing Policy 1 (February 1995) (1995 Report), available at http://www.ussc.gov/crack/exec.htm. The statute's mandatory minimum penalties were triggered by the quantities and types of drugs involved. Id. at 116. The 1986 Act also initiated the criminal distinction between powder cocaine and crack cocaine and established what has become known as the 100:1 quantity ratio.[2] Id. That is, offenses involving 5 kilograms of powder cocaine and 50 grams of crack cocaine both trigger the statute's ten-year mandatory minimum sentence. Id. Similarly, offenses involving 500 grams of powder cocaine and 5 grams of crack cocaine trigger the statute's five-year mandatory minimum sentence. Id. Congress differentiated between the two forms of cocaine, concluding

---

[2]The 100:1 ratio relates to the relative quantities of powder cocaine and crack cocaine required to trigger similar penalties and not the length of the sentence imposed. Nonetheless, the 100:1 ratio is often referred to as a "sentencing ratio."

crack cocaine was more addictive and produced more health and social problems.[3] Id. at 3.

In 1987, the United States Sentencing Commission (Sentencing Commission) used equivalences of the 100:1 quantity ratio in setting Guidelines sentences for various drug quantity levels. Id.; see also U.S.S.G. § 2D1.1 cmt. n.10. In 1988, Congress further distinguished crack cocaine in the Anti-Drug Abuse Act of 1988, which set a five-year mandatory minimum sentence for first offense simple possession of crack cocaine. 1995 Report at 1-2; see also 21 U.S.C. § 844(a).

By 1994, the federal sentencing policy for cocaine offenses was receiving extensive criticism. See 1997 Report at 1. Critics focused on the penalty differences between the two forms of cocaine and the disproportionate impact the more severe crack cocaine penalties had on African Americans. Id. The Sentencing Commission acknowledged these concerns in its February 1995 report to Congress and cited troubling findings regarding the 100:1 quantity ratio, which included: (1) African Americans were bearing the brunt of the higher sentences associated with crack cocaine offenses; (2) low-level street dealers selling crack cocaine were receiving far more severe sentences than the high-level powder cocaine suppliers, who sold the raw

---

[3]The dangers associated with crack cocaine include (1) crack cocaine's association with violent street crimes–gangs, guns, serious injury, and death; (2) crack cocaine's relative low-cost and widespread availability, making it accessible to the most vulnerable members of society; and (3) crack cocaine being more addictive because it is smoked, producing a more intense psychological and psychotropic effect than powder cocaine, which is snorted. United States Sentencing Commission, Special Report to the Congress: Cocaine and Federal Sentencing Policy 3-4 (April 1997) (1997 Report), available at http://www.ussc.gov/r_congress/newcrack.pdf.

Crack cocaine is not the only illicit drug Congress assigned a low quantity threshold sentencing trigger. For example, five grams of methamphetamine and one gram of LSD trigger the same five-year mandatory minimum sentence as do five grams of crack cocaine. See 21 U.S.C. § 841(b)(1)(B)(iii)-(viii).

material used to make crack cocaine; (3) the 100:1 quantity ratio was disproportionate relative to the harms associated with the two forms of cocaine; and (4) the evils associated with the use of crack cocaine were already accounted for through other sentencing Guidelines' enhancements, and therefore, use of the 100:1 quantity ratio might effectively result in double punishment. 1995 Report at xii-xv. The Sentencing Commission unanimously recommended changing the Guidelines' cocaine sentencing scheme. 1997 Report at 1.

On May 1, 1995, by a vote of 4 to 3, the Sentencing Commission issued its recommendations and proposed Congress change the Guidelines by adopting a 1:1 quantity ratio at the powder cocaine level and adding enhancements for violence and other harms associated with crack cocaine. Id. The Sentencing Commission's dissenting members believed elimination of the disparity was unwarranted because the recommended enhancements would not sufficiently account for the added harms associated with crack cocaine. Id. After conducting a hearing on the proposed changes, Congress passed legislation, Pub. L. No. 104-38, 109 Stat. 334 (Oct. 30, 1995), signed by President William Jefferson Clinton, rejecting the Sentencing Commission's proposed changes. Id. The legislation directed the Sentencing Commission further to consider changes to the statute and the Guidelines as they applied to cocaine trafficking and to submit new recommendations to Congress. Id. at 1-2.

In April 1997, the Sentencing Commission submitted its second report to Congress, unanimously agreeing "congressional objectives can be achieved more effectively without relying on the current federal sentencing scheme for cocaine offenses that includes the 100-to-1 quantity ratio." Id. at 9. The Sentencing Commission recommended reducing the quantity of powder cocaine while increasing the quantity of crack cocaine required to trigger the five-year mandatory minimum sentence. Id. The Sentencing Commission also recommended making the penalty for

simple possession of crack cocaine the same as the penalty for simple possession of powder cocaine.  Id. at 10.  Congress did not act upon those recommendations.

The Sentencing Commission issued a third report to Congress in May 2002, declaring the Commission "firmly and unanimously" agreed congressional objectives could be better achieved by substantially decreasing the 100:1 quantity ratio.  See United States Sentencing Commission, Report to the Congress: Cocaine and Federal Sentencing Policy 91 (May 2002) (2002 Report), available at http://www.ussc.gov/r_congress/02crack/2002crackrpt.pdf.  Therein, the Sentencing Commission recommended increasing the five-year mandatory minimum threshold quantity of crack cocaine to at least 25 grams, thus creating a powder cocaine to crack cocaine quantity ratio of 20:1.  Id. at 107.  Again, Congress chose not to act on the Sentencing Commission's recommendations.

### 2.    Judicial History

Opponents of the 100:1 quantity ratio also appealed to the judiciary, challenging the 100:1 quantity ratio on constitutional grounds.  However, these challenges proved unsuccessful.[4]  See generally, United States Department of Justice,

---

[4]For example, in United States v. Lewis, 90 F.3d 302, 306 (8th Cir. 1996), our circuit rejected an equal protection challenge, which was based on the Sentencing Commission's 1995 recommendations to eliminate the 100:1 quantity ratio due to its disparate impact on African-American defendants, holding, "[i]t is not for us to decide whether the 100:1 ratio is wise or equitable; that is a question for the popularly chosen branches of government."  The other circuits reached similar conclusions.  See United States v. Gaines, 122 F.3d 324, 329-30 (6th Cir. 1997) (concluding "Congress did not grant the courts broad discretion to apply the sentencing ratio of their choosing based on alleged injustices inherent in the 100:1 ratio," and despite the Sentencing Commissions recommendations to eliminate the quantity ratio, "[w]hen Congress and the Sentencing Commission disagree on matters of sentencing policy, Congress trumps"); United States v. Berger, 103 F.3d 67, 71 (9th Cir. 1996) (agreeing with other courts of appeals in declining to sentence the defendant under powder cocaine rather than crack cocaine penalties under the rule of lenity, concluding a district court

may not "override the express intention of Congress regarding penalties for crack cocaine and powder cocaine" because "[i]t is not the province of this Court to second-guess Congress's chosen penalty") (citations and internal quotations omitted); United States v. Butler, 102 F.3d 1191, 1194-95 (11th Cir. 1997) (rejecting an equal protection challenge based on the disparate impact of the 100:1 quantity ratio); United States v. Fonts, 95 F.3d 372, 374 (5th Cir. 1996) (per curiam) (joining other circuits in rejecting "the notion that a district court may override the express intention of Congress regarding penalties for crack cocaine and powder cocaine under either 18 U.S.C. § 3553(b) or [U.S.S.G.] § 5K2.0"); United States v. Teague, 93 F.3d 81, 84-85 (2d Cir. 1996) (rejecting an equal protection challenge to the disparate impact of the 100:1 quantity ratio between blacks and whites, concluding there was no evidence "Congress reaffirmed the sentencing disparity at least in part 'because of,' not merely 'in spite of,' its adverse effects upon blacks" (internal quotation omitted)); United States v. Hayden, 85 F.3d 153, 157-58 (4th Cir. 1996) (rejecting a constitutional challenge to the 100:1 quantity ratio based on Fourth Circuit precedent, and noting "Congress rejected the Sentencing Commission's [1995] report and recommendation and refused to change the disparity in crack cocaine versus powder cocaine sentences"); United States v. Anderson, 82 F.3d 436, 440-42 (D.C. Cir. 1996) (rejecting the proposition the crack/powder disparity can serve as a valid basis for downward departure); United States v. Sanchez, 81 F.3d 9, 11 (1st Cir. 1996) (affirming the district court's denial of a downward departure based on the Sentencing Commissions's 1995 report and recommendations, and concluding "we cannot blind our eyes to the fact that the Congress shot down the Commission's recommendation [to eliminate the 100:1 ratio]"); United States v. Alton, 60 F.3d 1065, 1071 (3d Cir. 1995) (reversing the district court's downward departure based on the disparate impact of the 100:1 quantity ratio, and reasoning "[w]e defer to Congress and the Sentencing Commission to address the related policy issues and to consider the wisdom of retaining the present sentencing scheme"); United States v. Jones, 54 F.3d 1285, 1293-94 (7th Cir. 1995) (rejecting defendant's challenge that the disparity in sentencing between crack cocaine and powder cocaine offenses disproportionately impacts African-Americans and violates due process, concluding Congress did not act with a discriminatory intent when it allowed the Guidelines disparate sentencing scheme); United States v. Robertson, 45 F.3d 1423, 1445-46 (10th Cir. 1995) (rejecting defendant's challenge that the distinction between crack cocaine and powder cocaine offenses "violate equal protection of the laws and constitute cruel and unusual punishment").

19, 2002) (citing cases), available at http://www.usdoj.gov/olp/cocaine.pdf.

Nearly ten years after the courts of appeals rejected various constitutional challenges to the 100:1 quantity ratio, the ratio again is being challenged pursuant to the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005). Because Booker eliminated the mandatory application of the Guidelines and directed district courts to impose sentences in accordance with the factors set forth in 18 U.S.C. § 3553(a), Booker, 543 U.S. at 311-14, district courts have varied from the now-advisory Guidelines by substituting a ratio other than 100:1, reasoning the 100:1 quantity ratio results in a sentence "greater than necessary" to reflect the interests of 18 U.S.C. § 3553(a)(2). See, e.g., Perry, 389 F. Supp. 2d at 280.

For example, Perry, upon which Spears relies, involved a post-Booker sentencing in a crack cocaine case. Id. In a published sentencing memorandum, the Perry court discussed the Sentencing Commission's 2002 findings and recommendations, and emphasized the Sentencing Commission's recommendation that Congress change the federal cocaine sentencing policy and reduce the drug quantity ratio to 20:1. Id. at 302-03 (citing the 2002 Report at 103, 107). Persuaded by the Sentencing Commission's recommendations, the Perry court rejected the 100:1 quantity ratio, reasoning "the advisory Guideline range for crack cocaine based on the 100:1 ratio cannot withstand the scrutiny imposed by sentencing courts when the § 3553 factors are applied." Id. at 307. The Perry court sentenced the defendant using a 20:1 quantity ratio, finding it made "the most sense" because it was the ratio recommended by the Sentencing Commission in the 2002 Report. Id. at 307-08.[5]

---

[5]The government voluntarily withdrew an appeal in the Perry case; however, the First Circuit rejected similar reasoning in United States v. Pho, 433 F.3d 53, 54-57 (1st Cir. 2006), abrogating Perry.

### 3. Spears's Sentence

At Spears's sentencing, Spears urged the district court to reject the 100:1 quantity ratio set forth in the Guidelines and adopt the rationale set forth in Perry. After initially calculating an advisory Guidelines range of 324 to 405 months' imprisonment based on a total offense level of 38 and a criminal history category of IV, the district court determined it would depart from that range stating, "I find the rationale in United States v. Perry to be very persuasive . . . incredibly scholarly . . . . I'm just going to adopt the legal rationale [of Perry] because I think it applies with full force and effect in this case." Thereafter, the district court recalculated the advisory Guidelines range based on a 20:1 quantity ratio, and varied downward to a total offense level of 34, resulting in an advisory Guidelines range of 210 to 262 months' imprisonment. Constrained by the statutory mandatory minimum, the district court sentenced Spears to 240 months' imprisonment. The district court stated its sentencing decision was based solely on the Perry rationale and the other § 3553(a) factors would be considered only if the sentence was reversed on the 20:1 ratio.

On appeal, the government challenges the reasonableness of Spears's sentence, arguing the district court erred by categorically rejecting the 100:1 quantity ratio and substituting its own ratio in calculating Spears's sentence.

### 4. Current Precedent

It is well settled in this post-Booker era, a sentencing court is guided by the factors set forth in § 3553(a). On appeal, we review the sentence imposed for reasonableness. See Haack, 403 F.3d at 1002. Section 3553(a) requires the district court, in compliance with the sentencing goals, to "impose a sentence sufficient, but not greater than necessary," by "considering the nature and seriousness of the offense, the history and characteristics of the defendant, and the need for the sentence to provide justice, deterrence, and other goals of punishment." United States v. Pappas, 452 F.3d 767, 773 (8th Cir. 2006).

We are not the first court of appeals to address whether <u>Booker</u> or § 3553(a), authorizes a district court to reject the 100:1 quantity ratio and substitute its own ratio in sentencing a defendant for a crack cocaine offense. The First, Second, Fourth, Seventh, and Eleventh Circuits each rejected downward variances based on this rationale, concluding "we see nothing in § 3553(a) or in <u>Booker</u> more generally that authorizes district courts to sentence defendants for offenses involving crack cocaine under a quantity ratio different from that provided in the Sentencing Guidelines." <u>United States v. Castillo</u>, 460 F.3d 337, 361 (2d Cir. 2006); <u>see</u>, <u>e.g.</u>, <u>United States v. Jointer</u>, 457 F.3d 682, 687-88 (7th Cir.) (rejecting the district court's substitution of its own ratio for the 100:1 ratio, concluding that although "the Sentencing Commission's detailed reports on crack and cocaine sentencing may have 'practical utility' to a district court's evaluation of the facts and circumstances of the individual case in light of the § 3553(a) factors," such reliance will not "shield a district court from a reasonableness review on appeal because, *at the core*, the district court must still tie the § 3553(a) factors to the individual characteristics of the defendant and the offense committed" (footnote and citation omitted)), <u>petition for cert. filed</u> (U.S. Oct. 27, 2006) (No. 06-7600); <u>United States v. Williams</u>, 456 F.3d 1353, 1367 (11th Cir.) ("The [100:1] drug quantity ratio not only reflects Congress's policy decision that crack offenders should be punished more severely, but also reflects its choice as to how much more severe the punishment should be. Federal courts are not at liberty to supplant this policy decision."), <u>petition for cert. filed</u> (U.S. Oct. 19, 2006) (No. 06-7352); <u>United States v. Eura</u>, 440 F.3d 625, 633 (4th Cir.) (concluding Congress decided to treat crack cocaine offenses more severely than powder cocaine offenses and instructed sentencing courts to avoid disparate sentences among crack cocaine dealers, therefore, to allow district courts to treat crack cocaine offenses on the same plane as powder cocaine offenses would contradict "two explicit Congressional directives" and would "not promote respect for the law, provide just punishment for the offense of conviction, or result in a sentence reflective of the offense's seriousness as deemed by Congress"), <u>petition for cert. filed</u>, 74 U.S.L.W. 1535 (U.S. June 20, 2006) (No. 05-11659); <u>United States v. Pho</u>, 433 F.3d 53, 54 (1st Cir. 2006)

(concluding it is inconsistent with Booker for a district court to "impose a sentence outside the advisory guideline[s] sentencing range based solely on [the district court's] categorical rejection of the guidelines' disparate treatment of offenses involving crack cocaine, on the one hand, and powdered cocaine, on the other hand"). The Tenth Circuit has hinted it would hold the same. See United States v. McCullough, 457 F.3d 1150, 1171-72 (10th Cir.) (concluding the district court did not err in refusing to impose a lower sentence based on the Guidelines' 100:1 sentencing disparity between powder and crack cocaine, and intimating its agreement with Pho and Eura that "it is error for a district court to impose a sentence outside the advisory guideline range based upon its own disagreement with the crack cocaine/powder cocaine disparity"), petition for cert. filed (U.S. Nov. 8, 2006) (No. 06-7742).

As the dissent points out, the Third Circuit recently reversed the district court's imposition of an advisory Guidelines sentence in a crack cocaine case, concluding "a sentencing court errs when it believes that it has no discretion to consider the crack/powder cocaine differential incorporated in the Guidelines–but not demanded by 21 U.S.C. § 841(b)–as simply advisory . . . [in] the post-Booker sentencing process." United States v. Gunter, 462 F.3d 237, 249 (3d Cir. 2006). We disagree, however, with the dissent's view that the Gunter court indicated "it is entirely appropriate for a district court to consider a different ratio under step three of the sentencing process." The Gunter court, in fact, reasoned just the opposite.

> Of course, the District Court is under no obligation to impose a sentence below the applicable Guidelines range solely on the basis of the crack/powder cocaine differential. Furthermore, although the issue is not before us, we do not suggest (or even hint) that the Court categorically reject the 100:1 ratio and substitute its own, as this is *verboten*. The limited holding here is that district courts may consider the crack/powder cocaine differential in the Guidelines as a factor, but not a mandate, in the post-Booker sentencing process.

-14-

Id. We do not adopt or endorse the Third Circuit's opinion that the crack/powder cocaine differential in the Guidelines may be a factor in the post-Booker sentencing process.

Post-Booker, our circuit has held a sentence "within the Guidelines based on the crack-powder disparity is not inherently unreasonable." United States v. Cawthorn, 429 F.3d 793, 802-03 (8th Cir. 2005), petition for cert. filed (U.S. May 25, 2006) (No. 05-11273). In addition, two panels of our circuit intimated agreement with our sister circuits "that a district court may not reasonably impose a sentence outside the advisory range based solely on a rejection of the disparate treatment of crack and powder cocaine under the guidelines." United States v. Brown, 453 F.3d 1024, 1027 (8th Cir. 2006); see Tabor, 439 F.3d at 831. With the issue squarely before us for the first time, we now join our sister circuits in holding neither Booker nor § 3553(a) authorizes district courts to reject the 100:1 quantity ratio and use a different ratio in sentencing defendants for crack cocaine offenses.

In parting company with our sister circuits, the dissent argues (1) it would be inconsistent with Booker to require a district court to follow congressional advice or policy within an advisory system, and as long as the district court presents a *reasoned* decision for declining to follow congressional advice, its decision should be upheld; (2) limiting the district court's consideration under § 3553(a) to the individual circumstances of a given case would render § 3553(a)(1) and § 3553(a)(2)(A) redundant; and (3) Booker anticipated some disparity in sentencing under an advisory-Guidelines system and only prohibited *unwarranted* disparities. We disagree.

First, the dissent suggests reason is the only limitation on a district court's sentencing discretion, stating, "Booker clearly does not give district courts license to ignore congressional advice or policy by deciding, for example, . . . the crack/powder cocaine ratio should be 5:1 rather than 100:1, the limitation now imposed upon district courts is *reason*." Under the dissent's rationale, a district court could adopt the 1:1

quantity ratio recommended by the Sentencing Commission in 1995, the 5:1 quantity ratio it recommended in 1997,[6] see 1997 Report at 1-2, or the 20:1 quantity ratio it recommended in 2002, see 2002 Report at 107, or any other ratio for that matter, as long as the district court makes a *reasoned* decision. Nothing in Booker authorizes district courts to alter the Guidelines; rather, Booker provides district courts the flexibility to tailor individual sentences for each defendant against the framework of the congressionally-approved Guidelines scheme. Booker, 543 U.S. at 264-65 (explaining the remaining features of the sentencing system will help "avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary").

Second, the dissent opines, "§ 3553(a)(2)(A) cannot be read as limiting district courts to consideration of case-specific circumstances, because such a reading would render the case-specific instructions of § 3553(a)(1) redundant." Yet, in the present case, the district court failed to perform a § 3553(a) analysis at all, stating, "once I made the decision I was going to vary on the [Perry] crack ratio basis, I didn't really look at the other [§ 3553(a) factors] because to me it was a moot question. I'll only look at that issue should this sentencing be reversed on the 20-to-1 ratio." As a result, the district court granted a downward variance, based *solely* on its disagreement with the congressional policy behind the 100:1 quantity ratio.[7] Although the dissent

_____

[6]The Sentencing Commission's 1997 Report recommended lowering the quantity of powder cocaine and raising the crack cocaine quantity required to trigger the mandatory minimum sentence, which would produce a 5:1 quantity ratio between powder cocaine and crack cocaine. 1997 Report at 9.

[7]Regarding the district court's § 3553(a) analysis, the dissent concludes, "the district court had a well-reasoned basis for concluding the use of the 20:1 ratio was appropriate to achieve a sentence 'sufficient, but not greater than necessary,'" because the "district court adopted as its own the decision in Perry, which in turn contains a well-reasoned discussion and summary of the [2002 Report]." It is counterintuitive to find the district court satisfied the individualized, case-specific evaluation required under § 3553(a) for Spears, by simply adopting, as the sole basis for imposing a

believes district courts are not limited to considering case-specific circumstances under § 3553(a), under this circuit's precedent, a district court must, at a minimum, perform the § 3553(a) analysis. See Haack, 403 F.3d at 1002-03 (explaining the proper sentencing sequence, stating district courts should first calculate a Guidelines sentence, then grant any traditional departures, and finally consider all other factors under § 3553(a) to determine whether to impose a Guidelines or a non-Guidelines sentence); see also United States v. Claiborne, 439 F.3d 479, 481 (8th Cir.) ("When the district court varies from the guidelines range based upon its analysis of the § 3553(a) factors, we must examine whether the district court's decision to grant a § 3553(a) variance from the appropriate guidelines range is reasonable, and whether the extent of any § 3553(a) variance . . . is reasonable." (citation and internal quotation omitted)), cert. granted,127 S. Ct. 551, 75 U.S.L.W. 3246 (U.S. Nov. 3, 2006) (No. 06-5618).

Third, the dissent reads the district court's Booker discretion too broadly. Booker did not transform the function of the judicial branch or "empower[] judges to define penalties for categories of crimes." Castillo, 460 F.3d at 356; see Eura, 440 F.3d at 633 (speculating about the variety of possible drug quantity ratios district courts might adopt, and concluding, "[t]hese scenarios tell us that sentencing courts should not be in the business of making legislative judgments concerning crack cocaine and powder cocaine"); Pho, 433 F.3d at 61-62 (holding, post-Booker, "a district court may exercise discretion in fashioning sentences–but that discretion was meant to operate only within the ambit of the individualized factors spelled out in section 3553(a)," and though broad, that discretion is not limitless).

Fourth, the dissent suggests that although § 3553(a)(6) instructs district courts to avoid unwarranted sentencing disparity, Booker anticipated there would be some

sentence, the legal rationale used by another sentencing court in an entirely unrelated case. Furthermore, reliance on Perry is misplaced, because Perry has been abrogated by Pho, 433 F.3d at 54.

lack of uniformity in sentences, because it is "a necessary evil of maintaining a constitutional sentencing regime." However, reading § 3553(a)(6) as allowing district courts to use a quantity ratio other than 100:1 trumps the 100:1 quantity ratio Congress built into 21 U.S.C. § 841(b). As the Second Circuit recently observed:

> Just as with any statute, the role of the judiciary is to determine what Congress meant by this statutory phrase. We have no authority to substitute our policy preferences for that of the legislative branch. Rather, our interpretation must be faithful to Congress's meaning as embedded in the words of its statute. While the 100:1 ratio clearly produces a disparity, it is one that Congress has mandated, one that Congress has continually refused to alter, despite the Sentencing Commission's various proposals for eliminating or reducing the ratio. . . . Moreover, § 3553(a)(6) cautions against unwarranted disparities only to the extent that they stem from different sentences given to "defendants with similar records who have been found guilty of similar conduct," and Congress has time and again clarified that in its view crack and powder cocaine offenses are not "similar conduct." No amount of citation to the Sentencing Commission's reports that are critical of the differential treatment of crack and powder cocaine can hide that fact, and in the end, we are constrained by the public policy choice Congress has made.

Castillo, 460 F.3d at 357 (citation omitted).

A judge's personal views regarding the Sentencing Commission's recommendations cannot supplant Congress's refusal to adopt those recommendations. In the twenty years since codifying the 1986 Drug Abuse Act, Congress has elected not to revise the 100:1 quantity disparity between powder cocaine and crack cocaine. The reason for this inaction, whether due to a political stalemate or other legislative grounds, is irrelevant to our inquiry. Our court, as an unelected body, cannot impose its sentencing policy views and dismiss the views of

the peoples' elected representatives. The judiciary must defer to Congress on sentencing policy issues.

Here, the district court did not vary from the advisory Guidelines range based on an individualized, case-specific evaluation of the facts or of the defendant. Rather, based on the district court's categorical rejection of congressional policy, the court impermissibly varied by replacing the 100:1 quantity ratio inherent in the advisory Guidelines range with a 20:1 quantity ratio. The district court erred by failing to make a proper analysis under § 3553(a) and by granting a downward variance based solely on its rejection of the 100:1 quantity ratio.

## III.    CONCLUSION

We affirm Spears's conviction, and we reverse his sentence and remand to the district court for resentencing consistent with this opinion.

BYE, Circuit Judge, with whom LAY, Circuit Judge, joins, concurring in part and dissenting in part.

I agree Spears's judgment of conviction should be affirmed. Because I would also affirm the sentence he received, I respectfully dissent from the part of the Court's opinion which reverses the sentence and remands to the district court for resentencing based upon a mandatory use of the 100:1 ratio between crack and powder cocaine in the United States Sentencing Guidelines. I fail to see how legislative policy within an *advisory* system, see United States v. Booker, 543 U.S. 220, 245 (2005) (holding the federal guidelines system must be advisory to preserve its constitutionality), can be binding.

I

The 100:1 ratio adopted by Congress manifests itself in two different ways for federal sentencing purposes, only one of which is at issue here. The congressional fiat which district courts clearly may not disregard is the extent to which the 100:1 ratio drives the statutory sentencing levels for drug offenses under 21 U.S.C. § 841(b). Here, one of those statutory sentencing levels required the district court to impose a mandatory minimum sentence of twenty years because Spears's offense involved fifty grams or more of crack cocaine and he had a prior felony drug offense. See 21 U.S.C. § 841(b)(1)(A).[8] Importantly, to the extent the legislative policy manifested itself directly in statute, the district court abided by the policy and imposed a statutory mandatory minimum sentence of 240 months.

The second way in which the 100:1 ratio manifests itself in federal sentencing is in the base offense levels set forth in United States Sentencing Guideline (U.S.S.G.) § 2D1.1 for drug offenses. Under § 2D1.1, a powder cocaine offender must be responsible for 100 times more cocaine than a crack cocaine offender to trigger the same base offense level. See U.S.S.G. § 2D1.1(c) (Drug Quantity Table). It is this manifestation of legislative policy which is at issue here.

Parts of this second manifestation of the 100:1 policy remain binding on district courts after Booker. First, district courts must correctly calculate an offender's advisory guideline range before taking the § 3553(a) factors into account. See United States v. Ruiz, 446 F.3d 762, 773 (8th Cir. 2006) ("Post-Booker, the calculation of the advisory Guidelines range represents the 'critical starting point.'") (quoting United States v. Thomas, 422 F.3d 665, 669 (8th Cir. 2005)). Thus, to the extent the policy of adopting a 100:1 ratio plays a factor in correctly calculating the advisory guideline

_____

[8]Congress does not require the same mandatory minimum sentence for a powder cocaine offender unless five kilograms of cocaine are involved, or 100 times the amount of crack cocaine. See id.

range, district courts must still yield to congressional will. Importantly, the district court heeded this legislative policy when it correctly calculated the advisory guideline range of 324-405 months.

Second, district courts must still consider the advisory guideline range as one of several factors Congress statutorily mandates be considered when imposing a particular sentence. See 18 U.S.C. § 3353(a)(4) ("The court, in determining the particular sentence to be imposed, shall consider . . . the sentencing range . . . as set forth in the guidelines[.]"). Importantly, the district court heeded that congressional mandate when it considered the advisory guideline range of 324-405 months before sentencing Spears.

After Booker, however, Congress may not mandate[9] a district court impose a sentence within a particular guideline sentencing range, because such a practice runs afoul of the Sixth Amendment. Booker, 543 U.S. at 233. Under the current system (which Congress has chosen not to change following Booker), Congress can only *advise* district courts on the imposition of a particular sentence within a particular range. Thus, if we start from the premise the guidelines' system is advisory, which we must, any advice given within such a system cannot be binding by its very nature, no matter whether the advice is on matters of broad policy or otherwise.

It is therefore inconsistent with Booker to hold district courts must follow congressional advice, or policy, when it is given within the context of an advisory system. In my view, this is the fundamental flaw in the reasoning of our sister circuits which have prohibited district courts from considering, under 18 U.S.C. § 3553(a), a different ratio than the 100:1 ratio used in the guidelines. While Booker clearly does

---

[9]Prior to Booker, the congressional mandate to sentence withing the guideline range was subject, of course, to certain exceptions for departures. But the departures had to be justified within the limits allowed by the guidelines, and thus, in that sense, were still mandated by Congress.

not give district courts license to ignore congressional advice or policy by deciding, for example, the base offense level for second degree murder should be thirty rather than thirty-eight, or the crack/powder cocaine ratio should be 5:1 rather than 100:1, the limitation now imposed upon district courts is *reason*. Booker, 543 U.S. at 261. Post-Booker, unreasonable or arbitrary departures from the advisory guidelines are still prohibited. But so long as a district court has a reasoned basis for declining to follow Congressional advice after considering it, the district court should be upheld. As explained below in Section III, the district court had a reasonable basis for concluding the 20:1 ratio was appropriate to achieve a sentence that was "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

My view of this matter is consistent with the view expressed by the Third Circuit in United States v. Gunter, 462 F.3d 237 (3d Cir. 2006). Our circuit, like the Third Circuit, requires the district courts to follow a three-step sentencing process in the post-Booker world: to correctly calculate the initial advisory guideline sentence; to determine any upward or downward departures within the advisory guidelines; and, finally, to consider any relevant § 3553(a) factors in determining whether a reasonable variance from the resulting advisory guideline range should be imposed. Compare Gunter, 462 F.3d at 247 (discussing this three-step sentencing process), with United States v. Shannon, 414 F.3d 921, 923-24 (8th Cir.2005) (discussing the same three-step sentencing process). The Third Circuit indicated that, while a district court was precluded from categorically rejecting the 100:1 ratio in step one of the sentencing process, see Gunter, 462 F.3d at 249, it is entirely appropriate for a district court to consider a different ratio under step three of the sentencing process, see id. at 248 ("[T]here is nothing special about the crack cocaine Sentencing Guidelines that makes them different, or less advisory, than any other Guidelines provision."). In this case, the district court did not categorically reject the 100:1 ratio under step one; it

-22-

appropriately considered a different ratio under step three with reference to the § 3553(a) factors.[10]

II

I do not believe all broad, categorical, legislative policy decisions are already taken into account in the calculation of the advisory guideline range, such that when it comes time for a district court to consider the § 3553(a) factors, the only factor left for consideration in departing from the advisory guideline range is the individual circumstances of a given case.  See, e.g., United States v. Pho, 433 F.3d 53, 62 (1st Cir. 2006) ("The clear import of this statutory framework is to preserve Congress's authority over sentencing policy and to guarantee that the exercise of judicial discretion over sentencing decisions be based on case-specific circumstances, not on general, across-the-board policy considerations.").  The statutory construct of § 3553(a) clearly does not support such a conclusion.

Section 3553(a) lists several factors district courts must consider when sentencing a particular defendant, three of which I emphasize to illustrate why the statute not only allows, but requires, district courts to consider more than the individual circumstances of a given case when sentencing a given defendant.

---

[10]While the district court reserved ruling on other § 3553(a) factors, it does not follow that the district court failed to perform a § 3553(a) analysis, as the majority contends.  The district court based its decision on the rationale of United States v. Perry, 389 F. Supp. 2d 278 (D.R.I. 2005), which clearly analyzed this issue under step three of the sentencing process (consideration of § 3553(a) factors), not step one (calculation of the advisory guideline range).  See Perry, 389 F. Supp. 2d at 301 ("Now sentencing courts must consider this disparity in the context of the § 3553 factors and must also vary from the Guideline range if the Guideline sentence is not consonant with the purposes of § 3553.").

First, § 3553(a)(1) explicitly requires district courts to consider "the nature and circumstance of the offense and the history and characteristics of the defendant." This factor requires district courts to consider the case-specific circumstances of a given defendant and a given offense. In contrast, section 3553(a)(2)(A) broadly requires district courts to consider sentences that "reflect the seriousness of the offense, . . . promote respect for the law, and . . . provide just punishment for the offense." The broad mandate in § 3353(a)(2)(A) cannot be read as limiting district courts to consideration of case-specific circumstances, because such a reading would render the case-specific instructions of § 3553(a)(1) redundant. Statutes cannot be construed so as to render one part inoperative. See United States v. Alaska, 521 U.S. 1, 59 (1997) ("The Court will avoid an interpretation of a statute that 'renders some words altogether redundant.'") (quoting Gustafson v. Alloyd Co., 513 U.S. 561, 574 (1995)).

Similarly, § 3553(a)(2)(A)'s directive to consider the seriousness of the offense cannot be interpreted to mean merely the seriousness of the offense as already taken into account in the calculation of the guidelines range, because such an interpretation would be redundant to the directive in § 3553(a)(4) to consider "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" Thus, if § 3553(a)(2)(A) is to be given any independent meaning, which it must, it requires district courts to evaluate the seriousness of, and just punishment for, an offense separate and apart from evaluating the case-specific circumstances of a given offense and a given defendant under § 3553(a)(1), or the guideline range under § 3553(a)(4). A district court must consider its own evaluation of the seriousness of a given type of offense. Such an evaluation is the essence of judging, not legislating. Here, the district court did its job by judging, not legislating; pursuant to § 3553(a)(2)(A) the district court gave reasoned consideration to the Sentencing Commission's own reasoned rejection of the 100:1 ratio.

Will such a practice create sentencing disparity? I do not doubt it will. When sentencing cocaine offenders, some district courts will choose to follow Congress's advice by sentencing defendants within the advisory guideline range incorporating the 100:1 ratio. Such a decision is reasonable, or, at a minimum, not inherently unreasonable. See United States v. Cawthorn, 429 F.3d 793, 803 (8th Cir. 2005). Other district courts will, however, consider the Sentencing Commission's recommendation – as well as the empirical data upon which the Commission based its recommendation – and impose a sentence which incorporates a 20:1 ratio.

Will such a practice create *unwarranted* sentencing disparity? See 18 U.S.C. § 3553(a)(6) (requiring district courts to consider "the need to avoid unwarranted sentence disparities"). Absolutely not. Both when district courts choose to follow congressional advice in adopting a 100:1 ratio and when district courts choose to follow the Sentencing Commission's recommendation to adopt a 20:1 ratio, the district courts will have reasoned bases for their decisions. Disparate sentences, based on reason, should not be viewed as *unwarranted*, as we have implicitly recognized. See United States v. Sebastian, 436 F.3d 913, 916 (8th Cir. 2006) (discussing the warranted sentencing disparities created by the "fast-track" program for certain immigration offenses).

Indeed, the Supreme Court predicted the reasonableness standard would necessarily create some lack of uniformity in the sentences imposed by district courts, but clearly implied the dissimilitude was a necessary evil of maintaining a constitutional sentencing regime:

> Regardless, in this context, we must view fears of a "discordant symphony," "excessive disparities," and "havoc" (if they are not themselves "gross exaggerations") with a comparative eye. We cannot and do not claim that use of a "reasonableness" standard will provide the uniformity [in sentencing] that Congress originally sought to secure.

Booker, 543 U.S. at 263.

The Supreme Court prefaced its comments on uniformity by remarking "[t]he Sentencing Commission will continue to collect and study appellate court decisionmaking. It will continue to modify its Guidelines in light of what it learns, thereby encouraging what it finds to be better sentencing practices. It will thereby promote uniformity in the sentencing process." Id. Ironically, the Sentencing Commission did precisely that in its 2002 report when it recommended a 20:1 ratio, because the 100:1 ratio was creating unwarranted sentencing disparities among cocaine offenders. Yet our Court now forbids district courts from considering the Commission's recommendation. I submit such an approach is misguided. Some disparity will inevitably occur during the transition from the old mandatory system to the new advisory system. By forbidding district courts from considering the Sentencing Commission's report, we perpetuate the *unwarranted* sentencing disparities the Commission identified between crack and powder cocaine offenders – in violation of 18 U.S.C. § 3553(a)(6) – at the expense of *warranted* disparities caused by the adoption of a constitutional, advisory guideline system.

## III

I believe the district court had a well-reasoned basis for concluding the use of the 20:1 ratio was appropriate to achieve a sentence "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). The district court adopted as its own the decision in United States v. Perry, 389 F. Supp. 2d 278 (D.R.I. 2005), which in turn contains a well-reasoned discussion and summary of the Sentencing Commission's May 2002 Report to Congress on "Cocaine and Federal Sentencing Policy" (hereinafter 2002 Report). I believe a thorough discussion of the findings and conclusions contained in the 2002 Report is necessary to fully understand the reasonableness of the district court's decision. I therefore turn my focus directly to the 2002 Report itself.

The Commission began its comprehensive 112-page report with an introductory section which attempts to explain Congress's reasons for adopting the 100:1 ratio. At the outset, the Commission noted "Congress bypassed much of its usual deliberative

process" when it passed the Anti-Drug Abuse Act of 1986 "[b]ecause of the heightened concern and national sense of urgency surrounding drugs generally and crack cocaine specifically[.]" 2002 Report at 5. "As a result, there were no committee hearings and no Senate or House Reports accompanying the bill that ultimately passed . . .. Thus, the legislative history for the bill that was enacted into law is limited primarily to statements made by senators and representatives during floor debates." Id. at 5-6.

The Commission next examined the legislators' statements in an attempt to identify their intent in adopting the 100:1 ratio, prefaced with the comment "there is no authoritative legislative history that explains Congress's rationale for selecting the 100-to-1 drug quantity ratio for powder cocaine and crack cocaine offenses." Id. at 7. Nonetheless, the Commission was able to identify from the limited legislative history "five important beliefs" to "suggest that Congress concluded that crack cocaine was more dangerous than powder cocaine and therefore warranted higher penalties[.]" Id. at 9. The five beliefs were:

- Crack cocaine was extremely addictive. The addictive nature of crack cocaine was stressed not only in comparison to powder cocaine, but also in absolute terms.

- The correlation between crack cocaine use and distribution and the commission of other serious and violent crimes was greater than that with other drugs. Floor statements focused on psycho-pharmacologically driven, economically compulsive, as well as systemic crime (although members did not typically use these terms).

- Physiological effects of crack cocaine were considered especially perilous, resulting in death to some users and causing devastating effects on children prenatally exposed to the drug.

- Young people were particularly prone to using and/or being involved in trafficking crack cocaine.

- Crack cocaine's purity and potency, low cost per dose, and the ease with which it was manufactured, transported, disposed or, and administered, were all leading to its widespread use.

Id. at 9-10.

The Commission then systematically exposed each of these "five important beliefs" as unsupported by its research and its study of actual federal drug sentences.

A

1.    Crack Cocaine is Not Extremely Addictive when Compared to Powder Cocaine.

Of the five beliefs upon which Congress based the 100:1 ratio, the belief that crack is extremely addictive when compared to powder cocaine is at least partially true. While crack cocaine is not extremely more addictive when compared to powder cocaine, crack's manner of ingestion – smoking vs. snorting – indicates it may be slightly more addictive than powder cocaine.

The Commission found "[c]ocaine in any form is potentially addictive." Id. at 18 (citing National Institute of Health (NIH), NIDA Research Report Series, Cocaine Abuse and Addiction, Pub. No. 99-4342 (May 1999); Karen Bolla et al., The Neuropsychiatry of Chronic Cocaine Abuse, 10 Journal of Neuropsychiatry and Clinical Neurosciences 280-289 (1998)). Cocaine in "any form . . . produces the same types of physiological and psychotropic effects once the drug reaches the brain." Id. at 17. As a consequence, "[c]rack cocaine and powder cocaine are both powerful stimulants and both forms of cocaine cause *identical* effects." Id. at 16 (emphasis added).

Due to the difference in the manner in which crack cocaine is administered into the body, however, "the risk of addiction *may be* greater for crack cocaine than for powder cocaine." Id. (emphasis added). "Smoking the drug produces a quicker onset, shorter duration, and more intense effects than snorting powder cocaine." Id. at 19.

> [A]lthough both powder and crack cocaine are potentially addictive, administering the drug in a manner that maximizes the effect (e.g., injecting or smoking) increases the risk of addiction. It is this difference in *typical* methods of administration, not differences in the inherent properties of the two forms of the drugs, that makes crack cocaine more potentially addictive to *typical* users.

Id.

In sum, the 2002 Report establishes that the "belief" crack cocaine is *extremely* more addictive than other drugs, including powder cocaine, is simply not well-founded. In addition, the Commission's ultimate recommendation to utilize a 20:1 ratio, rather than a 100:1 ratio, adequately takes into account the Commission's conclusion crack cocaine is somewhat more addictive than powder cocaine.

2. The Correlation Between Crack Cocaine Offenses and Other Serious/Violent Crimes is Not Significantly Greater than that with Powder Cocaine Offenses.

The "belief" that crack cocaine addiction causes people to commit other serious, violent crimes at an alarming rate is well-illustrated by one senator's statement during floor debates on the 1986 Act:

> We find again once people are hooked, all they can think about is staying high, that euphoria which they get, but there is a corresponding down that is just as deep in its trough as the high is at the crest of the wave. And so we find that people, when they are addicted, will go out and steal, rob, lie, cheat, take money from any savings, take refrigerators out of their houses, anything they can get their hands on to maintain that habit.

That, of course, has caused crime to go up at a tremendously increased rate in our cities and in our States – the crimes of burglary, robbery, assault, purse snatching, mugging, those crimes where people are trying to feed that habit. Our local police and our sheriffs have found themselves unable to cope with the crime.

Id. at 9 n.31 (quoting 132 Cong. Rec. 31,329-30 (daily ed. Oct. 15, 1986) (statement of Sen. Chiles)).

To determine whether this "belief" was warranted, the Commission conducted an extensive examination of data gathered from actual crack cocaine and powder cocaine offenses in the federal system. Id. at 32-62. Part of this examination focused on whether crack cocaine offenders actually commit other serious or violent crimes significantly more often than do powder cocaine offenders. Again, the Commission's examination of the actual data established this belief was unsupported. In fact, there is only a slight difference between powder and crack cocaine offenses *vis a vis* the involvement of other serious or violent crimes.

The Commission examined the following "aggravating factors" that often accompany drug offenses: weapon involvement, bodily injury, co-participants under eighteen, sales to minors, sales to pregnant women, and sales in a protected location. Id. at 52-58. From this examination, the Commission concluded "[t]he majority of powder cocaine and crack cocaine offenses did not involve aggravating conduct considered by many to be most egregious (*e.g.*, weapon involvement, bodily injury resulting from violence, and distribution to protected persons or in protected locations)." Id. at 32. The Commission also found "[t]he proportion of cases involving aggravated conduct generally has declined for both powder cocaine and crack cocaine offenses since 1995." Id.

For example, in 2000, using a very broad definition of "weapon involvement" that included everything from actual use of the weapon by the offender to a weapon merely being accessible by an unindicted co-conspirator, the Commission found

-30-

weapons were involved in 25.4 % of powder cocaine offenses and 35.2% of crack cocaine offenses.  Id. at 53.

With respect to bodily injury or death resulting from violence rather than  drug use, the Commission found deaths occurred at the same rate for both forms of the drug (3.4%), and bodily injury occurred in just 4.5% of crack cocaine offenses and just 1.4% of powder cocaine offenses.  There were actually slightly more threats of bodily harm involved in powder cocaine offenses (4.2%) than crack cocaine offenses (3.7%). Finally, with all three types of "bodily injury" considered (everything from mere threats to death), the vast majority of both forms of cocaine offenses involved *no* bodily injury (91.0% of powder cocaine offenses and 88.4% of crack cocaine offenses).  Id. at 57.

With respect to the involvement of co-participants under eighteen years of age, the Commission found it was "rare in both powder cocaine and crack cocaine offenses," occurring in just 1.8% of powder cocaine offenses and 4.2% of crack cocaine offenses.  Id.  Sales to minors were even more rare, occurring in just 0.8% of powder cocaine offenses, and even less in crack cocaine offenses, 0.5%.  Id. at 58. Sales to pregnant women were non-existent in crack cocaine offenses, and occurred in just 0.4% of powder cocaine offenses; sales in a protected location were also rare, occurring in just 0.9% of powder cocaine offenses and 4.5% of crack cocaine offenses.  Id.

In sum, the Commission's findings indicate there is only a marginal difference between crack cocaine and powder cocaine with respect to either's relation to other serious and violent crimes (with powder cocaine exceeding crack cocaine in some categories), and in the case of both forms of the drug the aggravating factors deemed to be the most egregious "still occurred in only a minority of the cases."  Id. at 32.

3.    Crack Cocaine Does Not Have Devastating Effects on Children Prenatally Exposed to the Drug.

Treating crack cocaine 100 times more severe than powder cocaine cannot be supported by the mistaken belief crack cocaine has a devastating effect on children prenatally exposed to the drug. That is a myth. In fact, the Commission's review of the research indicated "[t]he negative effects of prenatal exposure to crack cocaine are *identical* to the effects of prenatal exposure to powder cocaine." Id. at 21 (emphasis added).

In addition, the research indicated "[t]he negative effects of prenatal cocaine [in either form] exposure are significantly less severe than previously believed." Id. Dr. Deborah Frank, one of the authors of Growth, Development, and Behavior in Early Childhood Following Prenatal Cocaine Exposure: A Systematic Review, 285 Journal of American Medical Association 1613 (March 28, 2001), provided a written statement to the Commission reporting the effects of prenatal exposure to cocaine are "very similar to those associated with prenatal tobacco exposure." 2002 Report at 22 (quoting written statement Deborah A. Frank, M.D., to the U.S. Sentencing Commission, regarding Drug Penalties (Feb. 25, 2002) at 1).

The Commission also considered research conducted by Gale A. Richardson and reported at Prenatal Cocaine Exposure: A Longitudinal Study of Development, 846 Annals of the New York Academy of Sciences 144 (1998). While that study confirmed prenatal cocaine exposure caused children to have shorter attention spans, and to be less focused and more restless, it also concluded prenatal alcohol and marijuana use had the same effect on children. 2002 Report at 28 (citing Richardson's research). From this and other extensive research[11] reviewed by the

---

[11]The other research and studies considered by the Commission include: Vincent L. Smeriglio & Holly C. Wilcox, Prenatal Drug Exposure and Child Outcome: Past, Present, Future, 26 Clinics in Perinatology 1 (March 1999); Robert Arendt, et al., Sensorimotor Development in Cocaine-exposed Infants, 21 Infant Behavior & Development 627 (1998); Marylou Behnke et al., Incidence and description of structural brain abnormalities in newborns exposed to cocaine, 132 Journal of Pediatrics 291 (Feb. 1998); Virginia Delaney-Black, et al., Teacher-

Commission, the Commission concluded "[r]ecent research on prenatal exposure to cocaine generally indicates that the long-term negative effects of prenatal cocaine

---

Assessed Behavior of Children Prenatally Exposed to Cocaine, 106 Pediatrics 782 (Oct. 2000); David A. Bateman et al., The Effects of Intrauterine Cocaine Exposure in Newborns, 83 American Journal of Public Health 190 (Feb. 1993); Gale A. Richardson, et al., Growth of Infants Prenatally Exposed to Cocaine/Crack: Comparison of a Prenatal Care and a No Prenatal Care Sample, 104 Pediatrics (Aug. 1999); Robert Arendt, et al., Motor Development of Cocaine-exposed Children at Age Two Years, 103 Pediatrics 86 (Jan. 1999); Virginia Delaney-Black, et al., Prenatal Cocaine and Neonatal Outcome: Evaluation of Dose-Response Relationship, 98 Pediatrics 735 (Oct. 1996); Fonda Davis Eyler, et al., Birth Outcome From a Perspective, Matched Study of Prenatal Crack/Cocaine Use: I. Interactive and Dose Effects on Health and Growth, 101 Pediatrics 229 (Feb. 1998); Fonda Davis Eyler, et al., Birth Outcome From a Perspective, Matched Study of Prenatal Crack/Cocaine Use: II. Interactive and Dose Effects on Neurobehavioral Assessment, 101 Pediatrics 237 (Feb. 1998); Lynn T. Singer, et al., Cognitive and Motor Outcomes of Cocaine-Exposed Infants, 287 JAMA 1952 (Apr. 17, 2002 reprint); Hallam Hurt, et al., Children with In Utero Cocaine Exposure Do Not Differ from Control Subjects on Intelligence Testing, 151 Archives on Pediatrics & Adolescent Medicine 1237 (Dec. 1997); Ira J. Chasnoff, et al., Prenatal Exposure to Cocaine and Other Drugs: Outcome at Four to Six Years, 846 Annals of the New York Academy of Sciences 314 (1998); D. Rush & K.R. Callahan, Exposure to Passive Cigarette Smoking and Child Development: A Critical Review, 562 Annals of the New York Academy of Science 74 (1989); Ann P. Streissguth, et al., Neurobehavioral Dose-Response Effects of Prenatal Alcohol Exposure in Humans from Infancy to Adulthood, 562 Annals of the New York Academy of Science 145 (1989); Peter A. Fried, Behavioral Outcomes in Preschool and School-Age Children Exposed Prenatally to Marijuana: A Review and Speculative Interpretation, 164 NIDA Research Monograph 242 (1996); Fried et al., Differential Effects on Cognitive Functioning in 9- to 12-Year Olds Prenatally Exposed to Cigarettes and Marihuana, 20 Neurotoxicology and Teratology 293 (1998); N.L. Day, et al., Effect of Prenatal Marijuana Exposure on the Cognitive Development of Offspring at Age Three, 16 Neurotoxicology and Teratology 169 (Mar./Apr. 1994); Karol A. Kaltenbach, Exposures to Opiates: Behavioral Outcomes in Preschool and School-Age Children, 164 NIDA Research Monograph 230 (1996); Mark A. Plesinger, Prenatal Exposure to Amphetamines: Risks and Adverse Outcomes in Pregnancy, 25 Obstetrics & Gynecology Clinics of North America 119 (March 1998).

exposure *do not differ* from the long-term negative effects of prenatal exposure to other substances, both legal and illegal." Id. at 27 (emphasis added).

In sum, the 2002 Report indicates there is no reasoned basis for treating crack cocaine more severely for sentencing purpose than powder cocaine based on the harmful effects of crack to prenatal children, because the prenatal effects of powder cocaine and crack cocaine are *identical*.  Moreover, the 2002 Report indicates Congress's concern about the "devastating" effects of prenatal exposure to cocaine, in any form, is largely unfounded, because the harmful effects of cocaine do not differ from the harmful effects of other substances, such as tobacco, alcohol, and marijuana.

> 4.      Young People are Not Particularly Prone to Using and/or Being Involved in Trafficking Crack Cocaine.

The 2002 Report also dispels the belief that young people are particularly prone to using crack and trafficking in crack.  For example, the Commission found:

> Cocaine use historically has been relatively rare among high school seniors.  Powder cocaine use peaked in 1985, when 6.7 percent of high school seniors reported use, and decreased to its lowest point (1.3%) in 1992.  Crack cocaine use (on which data is available only from 1987) peaked in 1998, when 1.6 percent of high school seniors reported use, and decreased to its lowest level, also in 1992, at 0.6 percent.

> Data from the NHSDA [National Household Survey on Drug Abuse] suggest that crack cocaine use among 18- to 25-year old adults is even more rare than among high school seniors, and has shown a similar plateau in recent years.  Between 1994 and 1998, on average less than 0.4 percent of those young adults reported using crack cocaine within the last 30 days, and in 1998 powder cocaine was used by *seven times* as many young adults as crack.

Id. at 70 & n.147 (emphasis added).

The Commission's data, which tracked reported drug use among high school seniors from 1975 through 2000, indicated marijuana is by far the drug of choice among young users. See id. at 71, Fig. 24. For example, in 1987, 24.7% of high school seniors reported using some form of illicit drug, with 21% indicating use of marijuana, compared with 4.1% reporting use of powder cocaine and just 1.3% reporting use of crack cocaine. In 1999, of the 25.9% reporting use of some form of illicit drug, 23.1% reported marijuana, 2.5% reported powder cocaine, and just 1.1% reported use of crack cocaine. Id. Each year between 1975 and 2000 follows a similar pattern, with marijuana use comprising the lion's share of overall reported use, while reported crack cocaine use remained under or near just 1%. See id.

In addition, as noted above, the Commission identified the number of crack cocaine offenses which involved co-participants under the age of eighteen, concluding it was "rare" and occurred in just 4.2% of those offenses. Id. at 57. Crack cocaine offenses involving sales to minors are rarer yet, occurring just 0.5% of the time, even less than powder cocaine offenses where there is a sale to a minor 0.8% of the time. Id. at 58.

In sum, there is no evidence to suggest young people are particularly prone to using or trafficking in crack. In fact, the evidence indicates just the opposite – when the use of crack is compared to the use of powder cocaine, the evidence suggests powder cocaine use is more prevalent among young people than crack cocaine.

5.      Crack Cocaine's Purity, Potency, Low Cost Per Dose, Ease of Manufacture, etc., are Not Leading to its Widespread Use.

Finally, the Commission's report generally indicates crack cocaine use is not nearly as widespread as the use of powder cocaine. Figure 23 shows the estimated number of adults from 1979 through 1998 who report cocaine use, with estimates of the number of crack cocaine users available after 1987. Id. at 69. In every year from 1988 through 1998, the number of estimated crack users has remained relatively flat and has never exceeded 686,000. During that period of time, there have been

anywhere from 2.5 to 4.5 times as many powder cocaine users as crack cocaine users. For example, in 1988 the NHSDA estimated there were 3.14 million powder cocaine users in the United States and only 673,000 crack cocaine users; in 1998 there were an estimated 1.75 million powder cocaine users and only 437,000 estimated crack cocaine users.  Id.

In sum, there is no reasonable basis to suggest crack cocaine needs to be treated more severely than powder cocaine out of concern of a widespread crack epidemic. If anything, the evidence suggests powder cocaine should be targeted more severely than crack.

B

The 2002 Report concludes with the Commission's findings and recommendations.  As a result of its analysis, the Commission determined the 100:1 ratio was unjustified:

> After carefully considering all of the information currently available – some 16 years after the 100-to-1 quantity ratio was enacted – the Commission firmly and unanimously believes that the current federal cocaine sentencing policy is unjustified and fails to meet the sentencing objectives set forth by Congress in both the Sentencing Reform Act and the 1986 Act. The 100-to-1 drug quantity was established based on a number of beliefs about the relative harmfulness of the two drugs and the relative prevalence of certain harmful conduct associated with their use and distribution that more recent research and data no longer support.

Id. at 91.

The Commission listed four specific findings regarding the ratio that merit mention. They are: 1) Current Penalties Exaggerate the Relative Harmfulness of Crack Cocaine; 2)  Current Penalties Sweep Too Broadly and Apply Most Often to Lower Level Offenders; 3) Current Penalties Overstate the Seriousness of Most Crack

-36-

Cocaine Offenses and Fail to Provide Adequate Proportionality; and 4) Current Penalties' Severity Mostly Impacts Minorities. Id. at 93-103. I will highlight a few of the Commission's comments that have not already been discussed above.

> 1.     Current Penalties Exaggerate the Relative Harmfulness of Crack Cocaine.

The current 100:1 ratio exaggerates the relative harmfulness of crack cocaine for all the reasons discussed above which show there is very little difference between the dangers of powder cocaine and crack cocaine. In addition, the Commission engaged in a discussion of the comparative doses that can be obtained from the same amount of each type of the drug – an apples to apples comparison, if you will – to illustrate how current penalties even further exaggerate the relative harmfulness of crack cocaine because the same amount of cocaine will typically yield fewer doses of crack than powder:

> With respect to doses, one gram of powder cocaine[12] generally yields five to ten doses, whereas one gram of crack cocaine yields two to ten doses. Thus, 500 grams of powder cocaine – the quantity necessary to trigger the five-year mandatory minimum penalty – yields between 2,500 and 5,000 doses. In contrast, five grams of crack cocaine – the quantity necessary to trigger the five-year statutory minimum penalty – yields between ten and fifty doses.

Id. at 17.

For comparison purposes, then, a crack dealer who supplies a single user with a single dose of crack for just ten days would be subject to a five-year mandatory minimum sentence, while a powder cocaine dealer could supply *seven* users for an

---

[12]"One gram of pure powder cocaine under ideal conditions will convert to approximately 0.89 grams of crack cocaine." Id. at 16.

*entire year* before being subject to the same sentence. As the Commission found, such an approach "greatly overstates the relative harmfulness of crack cocaine." Id. at 93.

2.    Current Penalties Sweep Too Broadly and Apply Most Often to Lower Level Offenders.

As the Commission noted, "the mandatory minimum penalty structure established by the 1986 Act generally was designed to target 'serious' and 'major' drug traffickers for federal prosecution." Id. at 99. Congress intended to target "serious traffickers," defined as "the managers of the retail traffic," with five-year mandatory minimum sentences, and "major traffickers," defined as "manufacturers or the heads of organizations who are responsible for creating and delivering very large quantities" with ten-year mandatory minimum sentences. Id. In other words, the higher up the distribution chain the drug trafficker operated, the more severe the penalties would be. Furthermore, Congress desired to focus federal resources on those higher up the distribution chain as a means of preserving "scarce federal law enforcement resources," leaving the states to prosecute the lower-level dealers. Id.

The Commission determined Congress's intent to focus on the big fish, so to speak, is frustrated by the 100:1 ratio because the big fish deal in powder cocaine, not crack. "[C]rack cocaine is trafficked principally at the retail level and is usually converted from powder cocaine near the point of retail sale." Id. at 66. As a consequence, "[i]n 2000, the majority of federal crack cocaine offenders – *two thirds* – were *street-level dealers*." Id. "[O]nly 5.9 per cent of federal crack cocaine offenders performed trafficking functions (manager, supervisor) that are most consistent with the functions described in the Subcommittee report as warranting a five-year penalty." Id. "And only 15.2 percent performed trafficking functions (importer, high-level supplier, organizer, leader, wholesaler) that are most consistent with the functions described as warranting a ten-year penalty." Id.

Use of the 100:1 ratio results, then, in scarce federal resources being spent on the little fish rather than the big fish. In addition, the little fish dealing in crack

cocaine at the street level are receiving much more severe sentences than the big fish dealing in powder cocaine higher up the distribution chain:

> In sum, instead of targeting serious and major traffickers in a manner similar to the articulated congressional design of penalties for other major drugs of abuse, crack cocaine mandatory minimum penalties currently apply most often to offenders who perform low-level trafficking functions, wield little decision-making authority, and have limited responsibility. Based solely on trafficking functions, the penalties appear to overstate the culpability of most crack cocaine offenders.

Id. at 99-100.

3. Current Penalties Overstate the Seriousness of Most Crack Cocaine Offenses and Fail to Provide Adequate Proportionality.

"An important basis for the establishment of the 100-to-1 drug quantity ratio was the belief that crack cocaine trafficking was highly associated with violence generally." Id. at 100. As discussed above, however, this belief cannot be supported by the actual data studied by the Commission. The Commission identified two principal concerns raised by continuing to utilize the 100:1 ratio based upon this unsupported belief:

> First, to the extent that the 100-to-1 drug ratio was designed to account for the harmful conduct examined in this section, it sweeps too broadly by treating *all* crack cocaine offenders *as if* they committed these various harmful acts, even though most crack cocaine offenders in fact had not. In other words, the offense seriousness of most crack cocaine offenders is overstated by the 100-to-1 drug quantity ratio, suggesting that a differential this extreme is unjust.
>
> A second, related proportionately problem is that the current penalty structure provides no sentencing differential between crack cocaine offenders who do in fact commit those harmful acts and those who do not. Because the current penalty structure assumingly accounts for those

-39-

harmful acts in the quantity-based penalties, there are not specific sentencing enhancements in the primary drug trafficking guideline more appropriately targeting those offenders who actually commit those acts for especially severe penalties (with the exception of a two-level sentencing enhancement for possession of a dangerous weapon). As a result, the current penalty structure fails to provide adequate sentencing proportionality. In other words, the current penalty structure results in inappropriate sentencing uniformity for the most serious offenders.

Id. at 100-01.

The Commission indicated this unwarranted sentencing disparity could be avoided by "(1) providing specific sentencing enhancements targeted at the more culpable traffickers of crack cocaine or other drugs who commit those harmful acts, and (2) decreasing the quantity-based penalties for crack cocaine to correct for the overstatement of the offense seriousness and culpability of the majority of offenders who do not commit such acts." Id. at 101.

4.      Current Penalties' Severity Mostly Impacts Minorities.

Finally, the Commission focused on the discriminatory impact the 100:1 ratio has on blacks. "The overwhelming majority of offenders subject to the heightened crack cocaine penalties are black, about 85 percent in 2000. This has contributed to a widely-held perception that the current penalty structure for federal cocaine offenses promotes unwarranted disparity based on race." Id. at 102-03. "Perceived improper racial disparity fosters disrespect for the law and lack of confidence in the criminal justice system among those very groups that Congress intended would benefit from the heightened penalties for crack cocaine." Id.

District courts are required to consider a sentence that will promote "respect for the law." 18 U.S.C. § 3353(a)(2)(A). District courts are further required to consider "the need to avoid unwarranted sentencing disparities . . .." Id. at § 3353(a)(6). Sentencing black offenders more severely than similarly-situated white offenders,

with no reasoned basis for doing so, promotes disrespect for the law and the system rather than respect, and creates unwarranted and discriminatory sentencing disparities.

C

As a result of its findings, the Commission made several recommendations to Congress to change the current sentencing structure. Among those recommendations was the one at issue here, the recommendation "that a drug-quantity ratio of not more than 20-to-1. . . would appropriately reflect those harms that cannot be fully addressed by specific sentencing enhancements." Id. at 107.

Thus, the district court did not arbitrarily choose a 20:1 ratio. The district court's choice was based on a reasoned and detailed report which discussed the original premises upon which the 100:1 ratio was based, discussed at length why those original premises were unsupportable, and analyzed the unwarranted sentencing disparities created by the 100:1 ratio. I find everything in the 2002 Report to be eminently reasonable, and consequently, believe the district court was reasonable in relying upon it.

IV

While district courts must consider congressional advice when sentencing a particular defendant, they should not be required to abide by it when it is given within the context of an advisory system. I cannot square such an approach with the constitutional infirmities of a mandatory sentencing regime identified by the Supreme Court in Booker. I would therefore affirm not only Steven Spears's judgment of conviction, but also the reasonable sentence imposed by the district court.

_____